**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Leslie E. Orman, | No. CV-19-04756-PHX-DWL |
| Petitioner, | **ORDER** |
| v. | |
| Central Loan Administration & Reporting, et al., | |
| Respondents. | |

Pending before the Court are petitioner Leslie Orman's application to confirm an arbitration award (Doc. 5), respondents Central Loan Administration and Reporting's ("Cenlar") and CitiMortgage Incorporated's ("Citi") (collectively, "Respondents") motions to vacate the arbitration award and for sanctions (Docs. 13 and 15), Orman's motion for summary judgment (Doc. 19), and Orman's motion for sanctions (Doc. 33). This case arises from Orman's attempt to confirm a $10.3 million arbitration award arising from a proceeding in which Respondents did not participate. For the following reasons, Respondents' motions to vacate and for sanctions will be granted and Orman's application and motions for summary judgment and sanctions will be denied.

## BACKGROUND

I. <u>Factual Background</u>

Orman and Respondents have a long and contentious history. It arises from a 2007 mortgage on a home in Pennsylvania. (Doc. 35 ¶ 1). That mortgage was eventually assigned to Citi. (*Id.* ¶ 2.)

In 2010, Orman and her husband stopped making payments on the Pennsylvania mortgage. (*Id.* ¶ 3.) This led to extensive litigation by the Ormans, all of which was ultimately unsuccessful. (*Id.* ¶¶ 4-6. *See also* Doc. 13-1.) Citi foreclosed and sold the home in March 2019. (Doc. 35 ¶¶ 5, 7.) Orman apparently continues to litigate the foreclosure issue to this day in Pennsylvania state court. (*Id.* ¶ 8. *See also* Doc. 19 ¶ 5 [Orman's contention that "the Appeals Court may overturn the judgment for foreclosure for lack of jurisdiction and forgery"].)

Orman believes the Pennsylvania mortgage was actually rescinded in 2010. (Doc. 19 ¶ 11.) She nonetheless received multiple offers from Citi for a loan modification pertaining to the Pennsylvania mortgage, some of which were mailed to her current residence in Arizona. (*Id.*) In response to one such offer, Orman sent a document entitled "Conditional Acceptance for the Value/Agreement/Counter Offer to Acceptance of Offer" to Respondents. (Doc. 5-2 at 2; Doc. 35 ¶ 10; Doc. 5-4 [actual document].) That document purports to accept Respondents' offer (although it does not specify which offer) pursuant to Orman's "terms and conditions." (Doc. 5-4 at 1.) Among those terms were requests for "proofs of claim" that "the banking Holiday proclaimed by Pres. Roosevelt . . . has been suspended, declared over, abolished, repealed" (*id.* at 3), that the United States was in Chapter 11 bankruptcy (*id.* at 4), the United States was in a continuing state of emergency (*id.* at 5), and a "caveat" that Orman was not a "party to your 'social compact' (contract) known as the Constitution (Charter) of the UNITED STATES" (*id.* at 6.) Among the voluminous requests and caveats was what purported to be an arbitration agreement. (*Id.* at 8-11.) That agreement stated that none of the parties would "argue, controvert, oppose, or otherwise protest ANY of the facts already agreed upon by the parties and set and established herein," that acceptance of the contract through silence would result in a summary disposition by a randomly chosen arbitrator, and that any conflict about the agreement would be decided by the arbitrator. (*Id.* at 8-9.)

Orman sent this "counter offer" on April 4, 2019. According to her, she received no reply. (Doc. 5-2 at 2-3.) The time to respond was extended, but Respondents still failed

to respond. (*Id.* at 2.) Orman then sent a notice of default. (*Id.* at 2-3.) Again, Respondents failed to respond. (*Id.*) Finally, a request for arbitration was sent to Respondents, and they again took no action. (*Id.* at 3.)

Respondents have a different take on that sequence of events. Although Citi acknowledges it took no action when it received Orman's various mailings (Doc. 13 at 4), Cenlar contends it responded to Orman three different times. (Docs. 15-1, 15-2, and 15-3.) In its third response, which Cenlar contends was delivered to Orman's counsel in Pennsylvania, Cenlar explicitly rejected Orman's counter-offer. (Doc. 15-3.)

Regardless, Orman purported to proceed to arbitration. Robert Presley, of HMP Dispute Resolution, served as the arbitrator. (Doc. 5-2 at 1.) Presley based his decision only on documents provided by Orman—Citi and Cenlar provided nothing to him. (Doc. 5-3 at 1.) After summarizing Orman's counter-offer in a list containing entries such as "Banking Holiday still in progress" and "Invoked during time of war," Presley stated that he had "read the claim and other materials filed by the parties." (*Id.* at 3.) Then, "[a]fter considering the Claim, the testimony and evidence presented at the hearing," Presley awarded Orman $10,336,000.00 and forbade Respondents from enforcing an "inferior contract-claim against" Orman. (*Id.* at 4.) The award was notarized on May 28, 2019 in Kern County, California. (*Id.* at 5.)

Respondents claim they were not aware of this award until Orman filed her application for confirmation. (Doc. 13 at 6; Doc. 15 at 7.) Orman claims she invoiced Respondents for the award 30 days after it was issued. (Doc. 19 ¶ 7; Doc. 5-7.)

II. Procedural Background

On July 18, 2019, Orman, with the assistance of counsel, filed an application to confirm the arbitration award. (Doc. 1.) She filed an amended application the next day. (Doc. 5.) This was followed by a notice of lis pendens, giving notice that a proceeding to confirm the award for "monetary value exceeding $75,000 and return of property previously owned" by Orman was pending before the Court.[1] (Doc. 6.)

---

[1] This stems from the provision of Orman's "counter-offer" that purports to "supersede[] and predate[] as well as replace[] any and all prior agreements between the

- 3 -

Between August 15 and 27, 2019, Citi and Cenlar filed separate motions to vacate the arbitration award (or, in the alternative, dismiss for improper venue) and for sanctions. (Docs. 13, 15.)

On August 30, 2019, Orman filed a response that also served as a motion to strike Respondents' motions and a motion for summary judgment. (Doc. 19.) At the same time, Orman's counsel moved to withdraw. (Doc. 18.)

On September 3, 2019, Orman filed a supplement to her motion. (Doc. 20.)

On September 5, 2019, the Court issued an order that resolved Orman's motion to strike and Orman's counsel's motion to withdraw. (Doc. 21.) As for the former, the Court noted that Orman did not offer any reasons why Respondents' motions should be struck—instead, she offered a slate of reasons why those motions should be denied. (*Id.* at 1-2.) Accordingly, the Court denied the motion to strike but clarified that, to the extent it was also a motion for summary judgment, it would remain pending. (*Id.* at 2 n.1.)

As for the motion to withdraw, the Court first noted that Orman had filed two documents (Docs. 19, 20) in her own name while still represented by counsel, in violation of Rule 11. (*Id.* at 3.) Further, counsel had electronically filed those documents for Orman, which violated LRCiv. 5.5(d). (*Id.* at 4.) Thus, counsel was "squarely on the hook for those filings." (*Id.*) Turning to the merits of the motion to withdraw, the Court was skeptical about counsel's proffered reason—that Orman would be able to more effectively advocate her position without counsel's legal expertise—but nevertheless granted the withdrawal request. (*Id.* at 4-5.) However, the Court retained jurisdiction over counsel for purposes of Respondents' motions for sanctions. (*Id.* at 5.)

On September 23, 2019, Orman filed a motion to reconsider the September 5, 2019 order. (Doc. 28.) The Court denied that motion. (Doc. 29.)

The parties have now completed their briefing. Pending before the Court is Orman's application to confirm (Doc. 5), her motion for summary judgment (Doc. 19), and her

---

parties," including the mortgage on the Pennsylvania property. (Doc. 5-4 at 7. *See also* Doc. 5-3 at 4 [arbitration award, blocking Respondents from "enforcing inferior contract-claim against" Orman].)

motion for sanctions (Doc. 33). Respondents oppose the motion for summary judgment (Doc. 34), oppose the motion for sanctions (Doc. 36), and have fully briefed their own motions for sanctions and to vacate the arbitration award (Docs. 13, 15.) The argument underlying all of Respondents' papers is that the arbitration award was based on nothing—the "counter-offer" that served as the basis for the arbitration proceeding was not a contract between the parties, and thus could not require arbitration of any claims between Respondents and Orman. (*See, e.g.*, Doc. 15 at 2.) Because Respondents believe the "counter-offer" was obviously a meaningless document that could not serve as the basis for arbitration or this action, they have also requested sanctions against Orman and her former counsel. (*Id.* at 2.) On that point, Orman's former counsel has filed a response opposing the imposition of sanctions. (Doc. 25.)

**ANALYSIS**

I. <u>Arbitration Award</u>

Orman asks the Court to confirm her arbitration award under 9 U.S.C. § 9.[2] Respondents request that the Court vacate the award, arguing it is based on a legally baseless "contract" to which they never assented.

Ordinarily, a district court "must confirm" an arbitration award. *Aspic Eng'r & Constr. Co. v. ECC Centcom Constructors LLC*, 913 F.3d 1162, 1166 (9th Cir. 2019) (internal quotation marks omitted). "Neither erroneous legal conclusions nor unsubstantiated factual findings justify federal court review of an arbitral award under" the Federal Arbitration Act. *Id.* (internal quotation marks omitted). That said, a court may, when faced with a circumstance outlined in 9 U.S.C. § 10 or § 11, vacate an award. *Id.*

A. **Preliminary Matters**

As an initial matter, Orman asserts that Respondents' motion to vacate is improper at this stage. (*See, e.g.,* Doc. 33 at 5-6.) In her view, "only an Order to Vacate can be filed

---

[2] The Court notes the irony that, even though Orman purports not to be a party to the "'social compact' (contract) known as the Constitution (Charter) of the UNITED STATES" and disclaims any relationship that would bind her to the laws of the United States (Doc. 5-4 at 6-7), she nonetheless seeks the aid of a federal court of the United States to enforce a federal law.

- 5 -

into [a] 9 U.S.C. § 9 proceeding. Counsel is aware this Court has no Jurisdiction or Venue to make determinations on a Motion to Vacate under 9 U.S.C. § 10(a)(4)." (*Id.*) This appears to be an argument that, to prevent confirmation of her arbitration award, Respondents should have sought an order to vacate in a separate proceeding. To do so, Orman continues, Respondents had to litigate in the Eastern District of California, where the award was issued. (Doc. 37 ¶¶ 1-3. *See also* Doc. 38 at 3-5.)

This argument overlooks two key aspects of the law. First, the venue provisions of the Federal Arbitration Act contained in 9 U.S.C. §§ 9-11 are permissive, not mandatory. *Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co.*, 529 U.S. 193, 203-04 (2000). Thus, although the Eastern District of California may have been *a* proper venue under §§ 9 and 10, it was not the *only* proper venue.

Second, not only is a motion to vacate properly filed in response to a confirmation application, a district court "must" consider such a motion. *Johnson v. Wells Fargo Home Mortg., Inc.*, 635 F.3d 401, 412 (9th Cir. 2011). Although § 10, the provision governing vacatur, uses the permissive "may," the "only sensible combined reading of § 9 and § 10" is that, if grounds for vacatur exist, a district court must vacate the arbitration award. *Id.* Otherwise, "district courts, at their discretion," could confirm corrupt awards. *Id.*

In light of those points, the Court rejects Orman's argument that it cannot consider Respondents' motion to vacate. Respondents were not required to litigate in the Eastern District of California and it is proper for the Court to consider a motion to vacate filed in response to a confirmation application.

B. **Merits**

The Supreme Court has repeatedly emphasized that "arbitration is strictly a matter of consent." *Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC*, 816 F.3d 1208, 1211 (9th Cir. 2016) (quoting *Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 561 U.S. 287, 299 (2010). "[O]nly those who have agreed to arbitrate are obliged to do so." *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1046 (9th Cir. 2009). Here, Respondents assert that no contract existed that could legally bind them to arbitration. Whether a contract giving rise

to arbitration exists in the first place is a threshold question for the courts to decide. *Galilea, LLC v. AGCS Marine Ins. Co.*, 879 F.3d 1052, 1056 (9th Cir. 2018); *ItalFlavors*, 816 F.3d at 1211.

Whether a contract exists is determined by state-law contract principles. *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1093 (9th Cir. 2014). Were a nuanced question of contract law presented in this case, the Court would face a complex choice-of-law issue—the Court would first have to determine which state's choice-of-law rule applied, then apply that rule to determine the applicable contract law. This case involves an Arizona party claiming that a contract with corporations from South Dakota (Citi) and New Jersey (Cenlar) gave rise to an arbitration proceeding in California, which was related to the mortgage on a home in Pennsylvania.

The contract law question in this case, however, is so basic that the answer is the same no matter which jurisdiction's law may apply. It is a fundamental principle of contract law that silence does not constitute acceptance of a contract. Restatement (Second) of Contracts § 69 (Am. Law. Inst. 1981); *Johnston the Florist, Inc. v. TEDCO Const. Corp.*, 657 A.2d 511, 516 (Pa. Super. 1995) ("It is well settled that, silence will not constitute acceptance of an offer in the absence of a duty to speak.") (internal quotation marks and citation omitted); *Golden Eagle Ins. Co. v. Foremost Ins. Co.*, 25 Cal. Rprt. 2d. 242, 251 (Cal. Ct. App. 1993) ("As a general rule, silence or inaction does not constitute acceptance of an offer."); *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 284 (N.J. 1992) ("Silence does not ordinarily manifest assent . . . ."); *Terminal Grain Corp. v. Rozell*, 272 N.W.2d 800, 802 (S.D. 1978) (stating the general rule that silence alone is not assent to a contract). *See also In re Sky Harbor Hotel Props.*, 443 P.3d 21, 23 (Ariz. 2019) (applying the Restatement in the absence of contrary authority). As the Restatement notes, "[a]cceptance by silence is exceptional." Restatement § 69 cmt. a. There are only three circumstances where silence may constitute acceptance: (1) the offeree takes the offered benefit with reason to know it was offered with the expectation of compensation; (2) the offeree, in remaining silent, intends to accept the offer; and (3) previous dealings between

the parties give rise to the inference that silence constitutes acceptance. *Id*.

None of those exceptions applies here. At the time Orman sent her "counter-offer" to Respondents, the foreclosure on the Pennsylvania home had already occurred. An agreement on Orman's part settling the foreclosure dispute thus offered no benefit to Respondents. Nor is there any indication that Respondents intended to agree to Orman's offer. Citi simply ignored it, and Cenlar explicitly rejected it.[3] Finally, there was no pattern of past dealings between Orman and Respondents that would reasonably suggest Respondents' silence constituted assent to a contract. In fact, the opposite is true—Orman and Respondents have been legal adversaries for most of the past ten years.

Orman relies on the fact her offer purported to be a "self-executing unilateral arbitration agreement" as proof that Respondents' silence constituted assent. That argument, however, ignores that "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." Restatement § 69 cmt. c. Absent one of the exceptions outlined above, silence, no matter how Orman characterizes it, is not enough to manifest assent.

The lack of a contract between the parties easily resolves the rest of this case. Respondents have moved to vacate the arbitration award under 9 U.S.C. § 10. Specifically, Respondents seek relief under § 10(a)(4), which allows a district court to vacate an award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." Arbitrators exceed their powers "when the award is 'completely irrational' or exhibits a 'manifest disregard of the law.'" *Aspic*, 913 F.3d at 1166. "An award is completely irrational 'only where the arbitration decision fails to draw its essence from the agreement.'" *Id.* (citation omitted).

Here, there was no contract. Because there was no contract, it was impossible for any award premised on the "counter-offer" to draw its essence from a contract. Thus, any

---

[3] The Court need not resolve Orman's challenge to the authenticity of some of the documents pertaining to Cenlar's alleged rejection of her counter-offer because the outcome here would be the same even if Cenlar had never responded.

award stemming from the "counter-offer" is completely irrational and necessarily exceeds the power of the arbitrator. Respondents have thus satisfied 9 U.S.C. § 10's requirements, and the Court must vacate the arbitration award. *Johnson*, 635 F.3d at 412.

II. <u>Sanctions</u>

Respondents seek sanctions (*i.e.,* their fees) against Orman pursuant to the Court's inherent authority and separately seek sanctions against Orman's former counsel pursuant to the Court's inherent authority as well as under 28 U.S.C. § 1927. (Doc. 22 at 2-3; Doc. 23 at 3.) Orman's former counsel has filed a response. (Doc. 25.) Although Orman has not directly addressed Respondents' request for sanctions, she has strenuously argued the merits of her case and filed her own affirmative motion for sanctions. (Doc. 33.)

As a preliminary matter, the Court notes that in its September 9, 2019 order, it stated that Respondents sought attorneys' fees on three grounds—the two listed above, as well as Rule 11. (Doc. 21 at 2.) Upon further review, it appears that Respondents are only seeking sanctions under § 1927 and the Court's inherent authority. As stated in Cenlar's reply:

> This kind of deliberate wasting of the Court and party resources is precisely what 28 U.S.C. § 1927 is designed to remedy. Additionally, this Court has the inherent authority to "award counsel fees to a successful party when his opponent has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'"

(Doc. 23 at 7.) It thus appears that the reference to Rule 11 in Respondents' motions to vacate and for sanctions was intended merely to illustrate the depth of Orman's and her former counsel's failures, rather than serve as an independent ground for seeking sanctions. (Doc. 13 at 10; Doc. 15 at 13.)

A. **Orman's Former Counsel**

The Court will not sanction Orman's former counsel under § 1927. That provision cannot be applied to initial pleadings. *In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 435 (9th Cir. 1996). The only remaining documents for which counsel could be held responsible under § 1927 (because they were filed after the initial pleading and before counsel withdrew) are Orman's motion to strike and supplement thereto. (Docs. 19, 20.) Although the Court did state that counsel would remain on the hook for those documents

(Doc. 21 at 4), the Court, in its discretion, chooses not to sanction counsel for them under § 1927. To be sure, counsel's efforts to facilitate the filing of those documents displayed a lapse in judgment—counsel had not yet officially withdrawn, yet he allowed Orman to proceed pro se by filing documents signed by her through his CM/ECF account. This violated Rule 11, as well as Local Rules 5.5(d) and 83.3(c). Nevertheless, the Court sees the possibility that counsel was trying to fulfill two interests—withdraw from the case while maintaining ethical representation of his client.

Counsel, though, does not escape responsibility. Respondents also seek fees under the Court's inherent authority to "award sanctions in the form of attorneys' fees against a party or counsel who acts 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006) (quoting *Primus Auto. Fin. Servs., Inc. v. Batarse,* 115 F.3d 644, 648 (9th Cir. 1997)). Whereas 28 U.S.C. § 1927 and Rule 11 reach "only certain individuals or conduct," the Court's inherent power "extends to a full range of litigation abuses" and exists "to fill in the interstices." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991). A finding of bad faith is required for such sanctions. *Fink v. Gomez*, 239 F.3d 989, 993 (9th Cir. 2001). Bad faith includes "recklessness when combined with an additional factor, such as frivolousness, harassment, or an improper purpose." *Id.* at 994.

Counsel's decision to initiate this lawsuit by filing Orman's confirmation application is hard to interpret as anything but reckless. Counsel was presented with an obviously flawed document—the "Conditional Acceptance for the Value/Agreement/Counter Offer to Acceptance of Offer"—that was rife with gobbledygook and nonsense. Even a cursory review of the "Conditional Acceptance" document, and its conspiracy theories and pseudo-legal jargon, should have immediately raised red flags in counsel's mind. To be faced with this sort of information and still file the confirmation application is a textbook example of recklessness. (And if counsel didn't bother to carefully review the "Conditional Acceptance" document before filing the application, that was also reckless.)

This action was also completely frivolous. *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1369 (9th Cir. 1996) ("[F]rivolous . . . is a shorthand . . . used to denote a filing that is both baseless and made without a reasonable and competent inquiry."). Orman concocted a rambling document that she then had rubber-stamped by an arbitrator who merely restated the near-gibberish contained in Orman's "counter offer." A basic understanding of contract law would have informed any attorney that there was no sound legal basis for the award and no sound legal basis for a federal court to confirm the award. Yet counsel pressed on, even after counsel for Respondents urged him to withdraw the action. (Doc. 13 at 6.)

This could, perhaps, all be forgiven and attributed to an overworked or inexperienced attorney. Unfortunately, counsel's response to the request for sanctions makes clear that he has yet to see the problem in filing this action. Counsel maintains there was "nothing unreasonable or vexatious about filing an application for confirmation for a client who took all efforts to win the arbitration award." (Doc. 25 at 4.) Rather than explain why sanctions should not be imposed, counsel largely focuses on the merits of Orman's action, stating "[t]here is no error in seeking confirmation of the arbitration award under the arbitration act." (*Id.* at 4.) Finally, rather than take responsibility for his own actions, counsel accuses Respondents' attorney of a conflict of interest and suggests that Respondents' counsel, rather than Orman's, should be sanctioned. (*Id.* at 4.)

In a nutshell, Orman's former counsel was presented with a nonsensical legal document and a summary, unsubstantiated *$10.3 million* arbitration award and was then asked to file documents in federal court seeking confirmation of that award. Without confirming the validity of the arbitration proceeding or the validity of the underlying document, and despite the presence of obvious red flags, counsel did so. Counsel continues to argue his actions were proper and has now taken to casting stones at opposing counsel. At best—at *best*—counsel has recklessly filed a completely meritless action and points blame at everyone but himself.[4] Although imposing sanctions is an "extraordinary

---
[4] Orman claims she agreed to pay $103,360 of the arbitration award to counsel for his services in this case. (Doc. 38 at 14 ¶¶ 6-7.) Although that matter is between counsel and

- 11 -

1 remedy," the Court finds it is appropriate here. *In re Keegan*, 78 F.3d at 437.

B. **Orman**

The Court's inherent authority to impose sanctions extends not just to counsel, but to the parties to litigation. *Leon*, 464 F.3d at 961. As noted above, bad faith is required before a court may impose sanctions under its inherent powers. *Id.* The Court has no difficulty in finding that Orman has acted in bad faith.

To summarize, Orman, perhaps upset about the foreclosure of her home in Pennsylvania, crafted a "self-executing unilateral arbitration agreement" that she then sent to the general correspondence addresses of Respondents. (Doc. 19 ¶ 6; Doc. 15 at 5.) When this mailing was ignored or explicitly rejected, Orman took her document to some sort of self-proclaimed arbitrator.[5] That arbitrator, with zero analysis and zero input from Respondents, summarily awarded Orman over $10 million, a figure that was not rooted in any factual or legal basis whatsoever. When notices of a seemingly random arbitration related to a long-ignored document were ignored by Respondents, Orman then thought it appropriate to ask the Court to confirm her award.

To put it simply, Orman has spun one legal nullity into another. She has also filed a large volume of documents that contain legal arguments only slightly more realistic than those contained in her "counter offer." The Court will not abide this fraud. Orman had no basis for filing this action, for moving for sanctions against Respondents, or for any of the other papers she has filed. The bad faith emanating from Orman is palpable. Sanctions

---

Orman, if true, it both provides an explanation for counsel's poor judgment and raises concerns that counsel is charging exorbitantly excessive fees—counsel would have charged over $100,000 for filing a single application.

[5] Other courts have vacated arbitration awards issued by "HMP Dispute Resolution" under circumstances similar to those presented here. *Swanson v. Wilford, Geske & Cook,* 2019 WL 4575826, *3-4 (D. Minn. 2019) (vacating an "'arbitration award on the merits' [that] had been 'issued by HMP Dispute Resolution Arbitration'" where the parties seeking vacatur argued that "'Plaintiff commenced sham arbitration proceedings, without any agreement between the parties or authority to do so while the present action was pending; and unilaterally named an unqualified and biased individual to hear the sham arbitration proceedings for the purpose of obtaining a fraudulent award'"). The website associated with HMP Dispute Resolution states that it is a "private members only unincorporated association," that it "is the website division of Healing My People Ministries Trust," and that it allows consumers to enroll for $9 per month. *See* http://hmpservices.org.

are more than appropriate.

C. **Apportionment Of Fees**

Orman and her former counsel are each subject to sanctions, "[b]ut bad faith comes in various forms." *Edwards v. Vemma Nutrition*, 2019 WL 5684192, *14 (D. Ariz. 2019). Counsel's failures, although severe, are ones of judgment and prudence. The Court finds that counsel has acted poorly, but not with malice. On the other hand, the only explanation for Orman's actions is spite. For these reasons, the Court will order counsel to pay 10% of Respondents' fees will order Orman to pay the remaining 90%.

**\*\*\***

The volume of filings in this case belies its easy resolution. The document giving rise to the arbitration award and this case is a sham. The fact it gave rise to any litigation at all is disappointing, bordering on ludicrous. Orman's counsel should have known better, and it is clear that Orman has attempted to use this Court to advance a fraud.

Accordingly, **IT IS ORDERED** that:

(1) Respondents' motions to vacate and for sanctions (Docs. 13, 15) are **granted**;

(2) Orman's amended application (Doc. 5), her motion for summary judgment (Doc. 19), and her motion for sanctions (Doc. 33) are **denied**;

(3) The Clerk of Court shall enter judgment accordingly and terminate this action;

(4) Within 14 days of this Order, Respondents shall submit an electronic Microsoft Excel spreadsheet, to be emailed to the Court, opposing counsel, and Orman, containing an itemized statement of legal services with all information required by Local Rule 54.2(e)(1). This spreadsheet shall be organized with rows and columns and shall automatically total the amount of fees requested to enable the Court to efficiently review and recompute, if needed, the total amount of any award after disallowing any individual billing entries. This spreadsheet does not relieve Respondents of their burden under Local Rule 54.2(d) to attach all necessary supporting documentation; and

(5) Within 14 days of receipt of that email, Orman and her counsel shall email

to the Court and Respondents a copy of the Respondents' spreadsheet, adding any objections to each contested billing entry (next to each row, in an additional column) to enable the Court to efficiently review the objections. This spreadsheet does not relieve the non-moving party of the requirements of Local Rule 54.2(f) concerning its responsive memorandum. The Court reminds Respondents that attorneys' fees "must be compensatory rather than punitive in nature." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017).

Dated this 12th day of December, 2019.

Dominic W. Lanza
United States District Judge